

IN THE UNITED STATES DISTIRCT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KENNETH A. HINTON**<br>Plaintiff,<br><br>v.<br><br><br>**COMPUCREDIT CORPORATION**<br>Defendant.<br><br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>) Civil No. 1:08-cv-01675 (RWR)<br>)<br>)<br>)<br>)<br>) |

### PLAINTIFF'S FIRST AMENDMENT TO COMPLAINT

Now comes, the Plaintiff, Kenneth A. Hinton, pro se, who hereby submits his First Amendment to his original complaint filed on or about September 10, 2008 via the Defendant's request for transfer from the D.C. Superior Court, as filed in that Court on or about June 30, 2008 against the Defendant CompuCredit and hereby further alleges as follows:

1. This is an action under Sections 15 U.S.C. 1681, et seq, of the Fair Credit Reporting Act, 5(a) and 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a) and 53(b); and Sections 806-807 and 814 of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692d-1692e and 1692l. Through this action, the Plaintiff hereby requests redress, recompense and equitable relief, including rescission and reformation of contracts, restitution, and disgorgement, against CompuCredit Corporation ("Defendant"), for engaging in unfair or deceptive acts or practices in violation of Section 15 U.S.C. 1681, et seq, of the Fair Credit Reporting Act ; 5(a) of the FTC Act, as amended, and for engaging in acts or practices in violation of the FDCPA, 15 U.S.C. §§ 1692-1692p, et seq. as amended.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. §§ 45(a), 53(b) and 1692l, and 28 U.S.C. §§ 1331, 1337(a) and 1345.

RECEIVED
OCT 1 6 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

3. Venue is proper in the United States District Court for the District of Columbia under 28 U.S.C. §§ 1391(b) and (c), and 15 U.S.C. § 53(b).

**PARTIES**

4. Plaintiff, Kenneth A. Hinton is a resident presently domiciled in the District of Columbia and engages in commerce in the State of Virginia as well as in the jurisdiction of this Court.

5. Defendant CompuCredit Corporation ("CompuCredit") is a Georgia corporation that maintains its principal place of business in Atlanta, Georgia. CompuCredit transacts or has transacted business in the Northern District of Georgia.

6. Defendant CompuCredit has acted as a common enterprise while engaging in deceptive acts and practices, and other violations of law in connection with marketing Majestic Visa credit cards and the collection of defaulted Aspire credit card receivables.

7. CompuCredit is incorporated at the same address and at relevant times has shared common officers, and CompuCredit has formulated, directed, controlled or had authority to control, or participate in the acts and practices of. CompuCredit has marketed the Majestic Visa credit card and/or other financial products through a unified marketing program or programs that relied on the interrelationship between the companies. CompuCredit's Aspire Visa program, as well as other programs in which CompuCredit marketed high-fee credit cards playing an integral role in collecting the charged-off receivables (often including assessed fees) that CompuCredit generated through its Aspire Visa cards. Because CompuCredit has acted as a common enterprise, it liable for the deceptive acts and practices and other law violations alleged below that they have undertaken as a common enterprise. The common enterprise transacts or has transacted business in the District of Columbia and in Northern District of Georgia and a substantial part of the events or omissions giving rise to the claims asserted herein has occurred in the District of Columbia and in Northern District of Georgia.

8. The acts and practices of Defendants alleged in this Complaint have been in or affecting the Plaintiff who engages in various business and consumer commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' COURSE OF CONDUCT

9. CompuCredit provides various consumer credit products and related financial services in the subprime credit market. These products and services include, but are not limited to, credit cards, stored value cards, payday lending, auto-financing, and debt collection. Jefferson Capital collects consumer debts it has purchased from creditors and other debt collectors and consumer debts owed to third parties.

10. CompuCredit's credit card business consists principally of marketing, lending, servicing and debt collection activities. Through contractual arrangements with various banks, CompuCredit has marketed subprime credit cards to Plaintiff under multiple brand names, including but not limited to "Aspire," "Aspire A Mas," "FreedomCard," "Tribute," "Imagine," "Majestic," "Aspen," "Emerge" and "Fingerhut Credit Advantage." The banks with which CompuCredit has contracted to market these cards include but are not limited to Columbus Bank & Trust Company ("CB&T"), which has issued a significant number of CompuCredit's subprime cards. The banks with which CompuCredit has contracted are supervised by various federal banking agencies, including but not limited to the Federal Deposit Insurance Corporation ("FDIC"), the Office of Thrift Supervision ("OTS"), and the Office of the Comptroller of the Currency ("OCC").

11. Under one or more of these contracts, CompuCredit has had the sole and exclusive right to solicit applications for certain credit cards; has created, designed, and distributed the marketing materials; established the credit cards' terms and conditions; developed the underwriting and credit criteria; administered the card programs; maintained customer service functions; and purchased all account receivables (except for a one-time sum that has been retained by the bank, e.g., in the case of CB&T, $1 million), including fees, finance charges and principal balances on purchases and cash advances. CompuCredit has assumed the costs and risks for administering the credit card programs, and has represented and warranted to the banks, and has assumed contractual

responsibility for ensuring, that all solicitation materials and the terms and conditions for its credit cards comply with all applicable laws.

12. The banks with which CompuCredit has contracted have been the issuers of the credit cards and have had authority to review and approve the credit cards' terms and conditions, underwriting and credit criteria, and solicitation materials. As the issuing banks, they have initially owned the account receivables, but on a daily basis, have transferred to CompuCredit 100% of the account receivables (except for a one-time sum that has been retained by the bank, e.g., in the case of CB&T, $1 million). Overview

13. Since at least 2001, CompuCredit has marketed general purpose Visa credit cards to English-speaking and Spanish-speaking Plaintiff across the country under several brand names under agreements with one or more banks.

14. In numerous instances, as discussed below, CompuCredit misrepresented the credit limits on its credit cards, failed to disclose the up-front fees charged for some of its credit cards, and failed to disclose how certain transactions could adversely affect the available credit on the credit cards. With regard to one of its programs, CompuCredit misrepresented that Plaintiff would receive immediately a credit card if they agreed to transfer an existing debt to the credit card.

15. The "Aspire" Visa and "Majestic" Visa programs, issued by CB&T, and their solicitations, discussed below, are typical and illustrative of CompuCredit's business practices.

16. The Aspire brand comprises two or more product lines, including what CompuCredit internally has named "Little Rock" accounts and "Core" accounts. CompuCredit markets "Little Rock" accounts to Plaintiff with credit ratings on the lower end of the subprime spectrum. CompuCredit markets "Core" accounts to Plaintiff with credit ratings that generally are below prime, but which are higher than those of Plaintiffs who are offered the Little Rock card.

17. CompuCredit markets its "Majestic" Visa product to Plaintiff with unpaid debt that has been charged-off by a prior creditor. Marketing the Aspire Little Rock Visa Program

18. Since approximately 2001, CompuCredit has marketed its Aspire Little Rock Visa cards through numerous direct-mail solicitations, inbound and outbound telemarketing, and on the Internet, including at www.aspireyes.com.

19. As described below, CompuCredit's written solicitations for the Aspire Little Rock Visa Card misled Plaintiffs into believing that they would receive a Visa credit card with $300 in available credit. In addition, CompuCredit failed to disclose adequately significant up-front fees it charged Plaintiffs. In fact, CompuCredit assessed approximately $185 in up-front fees and reduced the available credit to $115. CompuCredit's ultimate disclosure of the fees in its accompanying Summary of Terms did not cure the deception.

20. CompuCredit has originated more than two million Aspire Little Rock Visa card accounts for Plaintiffs who responded to these solicitations, assessing approximately $185 in up-front fees at origination. More than 1.1 million Plaintiffs activated their accounts. Direct Mail Solicitations

21. In numerous instances, CompuCredit has sent direct mail solicitations to Plaintiffs nationwide representing that consumer's who received the solicitation had been "Pre-Qualified" for an unsecured Visa credit card with no deposit required, no deposit fee, and/or no application fee.

22. In a typical and illustrative direct mail solicitation package, CompuCredit has included a one-page cover letter; a one-page document entitled "Visa Pre-Qualified Acceptance Certificate"; a folded insert entitled "Introducing: the Aspire Visa Card," which is a different size and on a different color paper; and a double-sided document with one side entitled "Summary of Credit Terms" and the other side entitled "Terms of Offer." CompuCredit has arranged these materials in such a way that, as they are removed from the envelope, the cover letter faces outward in one direction and the "Visa Pre-Qualified Acceptance Certificate" (which includes the Plaintiff's mailing address that appears in the envelope's address window) faces outward in the other direction, with the remaining materials sandwiched between them.

23. On a typical and illustrative direct mail solicitation envelope, CompuCredit has represented, in bold text, set aside from other text, and in a font larger than much of the text of the contents of the envelope: **We think you deserve more credit!**

In addition, CompuCredit has represented on the envelope, in bold text, set aside from other text, and in a font larger than much of the text of the contents of the envelope< You're Pre-Qualified! No Deposit Required

24. In a typical and illustrative direct mail solicitation package, CompuCredit also has represented, in the cover letter, at the top of the page, set aside from other text, and in bold: **You're Pre-Qualified! Unsecured Visa card! Credit line increase within 6 months when you make your payments on time\*\*! No deposit required! Rebuild your credit** After the heading described above, CompuCredit further states, "**You have been PRE-QUALIFIED\* for the Aspire Visa card with a credit limit of $300\*. . . . And unlike a secured credit card, your Aspire Visa does not require a deposit.**" At the bottom of the page, in a smaller font than the representations described above and the main text of the letter, CompuCredit has included several disclaimers, including a disclaimer after the "\*" symbol instructing Plaintiffs to "[s]ee the enclosed insert which is incorporated here by reference, for a Summary of Credit Terms and Terms of Offer. This offer is subject to further review of financial information. Your available credit line may be reduced by certain fees that will be billed directly to your account, including an annual fee, an account opening fee, and an account maintenance fee, as described in the Summary of Credit Terms." The disclaimers after the "\*\*" and "†" symbols explain, respectively, that Plaintiff who make four minimum monthly payments on time and remain in good standing will receive a credit line increase and that CompuCredit will report the Plaintiff's account balance to the three major credit bureaus. CompuCredit makes no other mention of fees in this typical and illustrative cover letter.

25. In a typical and illustrative direct mail solicitation package, CompuCredit also has represented, in the one-page document entitled "Visa Pre-Qualified Acceptance Certificate," in bold text, set aside from other text, and in a font larger than the other text: **No Deposit Fee, No Application Fee, Pre-Qualified** CompuCredit makes no other mention of fees in this typical and illustrative document entitled "Visa Pre-Qualified Acceptance Certificate.".

26. In a typical and illustrative direct mail solicitation package, CompuCredit also has represented, in the insert, in bold text, set aside from other text: Benefits

No deposit required Regular account review for credit line increases Acceptance at over 25 million locations worldwide and at the bottom of the page, set aside from other text, in bold: **You're Pre-Qualified!**
CompuCredit makes no mention of fees in this typical and illustrative insert.

27. The "Summary of Credit Terms" included in a typical and illustrative direct mail solicitation package has included a "Schumer box" which reflected, in a small font, and printed among other information, an "Annual Fee" (typically $150), an "Account Opening Fee" (typically $29), and a "Monthly Maintenance Fee" (typically $6.50 or $7.50). This information has not been as clear or prominent as, or in any proximity to, CompuCredit's representations set forth above about the fees that did not apply.

28. As a result, CompuCredit did not inform the Plaintiff about applicable fees, nor did they explain that the Plaintiffs' $300 credit limit would be reduced by these fees, resulting in an available credit limit of approximately $115.

29. In a typical and illustrative direct mail solicitation, CompuCredit has instructed Plaintiff who are interested in requesting an Aspire Visa card to complete and return the "Acceptance Certificate," or for faster processing, to call a toll-free telephone number or visit CompuCredit at www.aspireyes.com.

30. Although CompuCredit modified certain aspects of its solicitations over time, the modifications, discussed below, did not cure the misleading and/or deceptive claims.

31. For example, at or near the end of 2004, CompuCredit added a notation below the Schumer box that calculated the amount of available credit that would remain after CompuCredit deducted its fees. However, the footnote was printed in small, compact text; was placed below another footnote describing an unrelated issue (the Plaintiff's "Pre-Qualified Status"); and was "dangling" i.e., not linked to any text in the Schumer box. The modification did not substantially alter the solicitation and did not cure the misleading impression created by the rest of the solicitation that Plaintiffs would receive $300 in available credit when they received the card. See, e.g., Attachment B [Aspire Little Rock Visa direct mail solicitation with March 3, 2005 return date].

32. At or near mid-2005, CompuCredit changed the footnotes on the cover letter so that only one larger footnote appeared, referring Plaintiffs to the reverse side of the letter for "important information," including "fee and credit limit details." The reverse

side of the cover letter, however, did not provide the promised details, but referred Plaintiff to the "Summary of Credit Terms." These modifications did not inform many Plaintiffs about the applicable fees and that the credit limit would be reduced by these fees in a manner that Plaintiffs could understand or notice.

33. At or near the beginning of 2006, CompuCredit eliminated all reference to "fee and credit limit details" from the front of the cover letter, and changed the reverse side of the cover letter to state that Plaintiffs' credit lines "will" be reduced by certain fees. These modifications did not inform many Plaintiffs about applicable fees in a manner that Plaintiffs could understand or notice.

### Telemarketing

34. For those Plaintiff who have called the toll-free number to apply for a Little Rock card, in numerous instances, telemarketers following CompuCredit provided Scripts have not disclosed the fees that are applicable unless asked. Instead, CompuCredit telemarketers following the scripts have told Plaintiff they were required to "send your $20 first payment in order to use your card."

35. In some instances, even if Plaintiffs have requested that a phone agent verify the terms and conditions of the card, agents responded by providing a lengthy explanation of the APR, including how the APR is calculated based on the prime rate, where in the Wall Street Journal the prime rate is published and on what day, as well as the mechanics of calculating increases in the APR based on the prime rate in the event of serious delinquency.

36. In numerous instances, Plaintiff who have applied for the Little Rock Visa card online have been required to navigate through eight screens, provide sensitive personal information, and actually apply for the card, without ever being informed of the fees. Only after completing these steps have the fees been disclosed on a screen that asks Plaintiff to accept the card offer.

### Card Fulfillment Materials

37. In numerous instances, after Plaintiffs have completed the application process and have been approved for a Little Rock Visa card, CompuCredit has mailed them a fulfillment package including a credit card that has not been activated; a card carrier page

with a perforated payment coupon at the bottom; a return-payment envelope; and a copy of the Bank Credit Card Agreement.

38. In a typical and illustrative fulfillment package, CompuCredit has represented, on the top half of the card carrier page, in boldfaced print:

**Your New Aspire Visa Gold Card Has Arrived........ To Begin Using it.....**
1. Make your $20 initial payment*. . .
2. Allow 7-10 days for payment processing.
3. Call to verify receipt of your card. . . .
4. Your card is now fully activated and is ready to be used. Separate from these representations, the card carrier states, "Activate Your Card Today!" Below these representations is a perforation line and an instruction to detach and return the lower part with the initial payment. Although the card carrier instructs Plaintiff to "Make your $20 initial payment*," there is nothing on the front of the card carrier page explaining what the asterisk means. The front of the card carrier page does state, in small type just above the perforation line, "See Summary of Terms and any additional disclosures on the back." The reverse side of the card carrier page reflects, in a small font, in a box with other information, an "Annual Fee" (typically $150), an "Account Opening Fee" (typically $29), and a" Monthly Maintenance Fee" (typically $6.50 or $7.50). This information has not been as clear or prominent as, or in any proximity to, CompuCredit's representations set forth above.

39. In numerous instances, Plaintiff who received this typical and illustrative card carrier were led to believe that they were obligated to make only a $20 payment, not $185 in up-front fees, for the card. Marketing the Aspire Core Visa Program

40. Since at least 2001, CompuCredit has marketed Aspire Core Visa cards through numerous direct-mail solicitations, inbound telemarketing, and on the Internet, including at www.aspireyes.com.

41. As described below, CompuCredit's written solicitations for the Aspire Core Visa card mislead Plaintiffs into believing that they would receive credit cards with available credit up to a certain amount and that the card could be used for any purpose, including cash advances. In fact, CompuCredit withheld half of the available credit until the fourth month after card activation. Further, CompuCredit used a behavior scoring

9

model to review cardholders' use of the card and it reduced cardholders' credit limits if the cardholders used their cards for certain purposes, including one of the touted benefits of the card, obtaining cash advances.

42. CompuCredit has originated more than four million Aspire Core Visa credit card accounts for Plaintiff who responded to these solicitations.

### Direct Mail Solicitations

43. Since at least 1997, CompuCredit has sent to Plaintiffs nationwide Core Visa card direct mail solicitations representing that Plaintiffs were "Pre-Qualified" to receive an Aspire Visa card.

44. In a typical and illustrative Aspire Core Visa card direct mail solicitation package sent to Plaintiff from at least 2001 through at least early 2005, CompuCredit included a double-sided cover letter, a one-page document entitled "Visa Gold Pre-Qualified Acceptance Certificate," and a double-sided document with one side entitled "Summary of Credit Terms" and the other side entitled "Terms of Offer." CompuCredit has arranged these materials in such a way that, as they are removed from the envelope, the cover letter faces outward in one direction and the "Visa Pre-Qualified Acceptance Certificate" (which includes the consumer's mailing address that appears in the envelope's address window) faces outward in the other direction, with the remaining materials sandwiched between them.

45. On a typical and illustrative Core Visa card direct mail solicitation envelope sent to Plaintiff through at least early 2005, CompuCredit represented, in bold text, set aside from other text, and in a font larger than much of the text of the contents of the envelope: **No Annual Fee No Application Fee Credit line up to: $3,250** to Plaintiff through at least early 2005, CompuCredit also represented, on the front side of the letter: **YOU have earned a new Aspire Visa Gold card. It can be used at millions of places around the world, and it costs you nothing to send for your card. No deposit fee! No application fee! Great credit line! Use your new credit card to buy the things you want right away, or to get money from most cash machines.**
At the bottom of the page, in a smaller font than the representations described above and the main text of the letter, CompuCredit has included several disclaimers, including a disclaimer after the "*" symbol instructing Plaintiff to "[s]ee the enclosed insert which is

10

incorporated here by a reference for a Summary of Credit Terms and Terms of Offer. This offer is subject to further review of financial information." The only other disclaimer on the page, in a small font, after the "†" symbol, explains that certain restrictions, limitations, and exclusions may apply to promised benefits such as auto rental insurance and extended warranty service.

47. On the back side of the typical and illustrative Core Visa card direct mail solicitation cover letter sent to Plaintiff through at least early 2005, CompuCredit also represented: **Great Credit Line up to the total on the Acceptance Certificate**. Plus, as long as you are an active customer in good standing, we will review your account for increases periodically. At the bottom of the page, in a smaller font than the representations described above and the main text of the letter, CompuCredit has included disclaimers, including a disclaimer after the "*" symbol instructing Plaintiff to "[s]ee the enclosed insert which is incorporated here by a reference for a Summary of Credit Terms and Terms of Offer. This offer is subject to further review of financial information." *The only other disclaimer on the page, in a small font, after the "†" symbol, states that certain restrictions, limitations, and exclusions may apply.*

48. In a typical and illustrative Core Visa card direct mail solicitation sent to Plaintiff through at least early 2005, CompuCredit also represented, in the one-page document entitled "Visa Pre-Qualified Acceptance Certificate," in bold text, set aside from other text, and in a font larger than the other text: **No Annual Fee No Application Fee Credit line up to: $3,250** There are no disclaimers on the Acceptance Certificate.

49. None of the documents included in the typical and illustrative direct mail solicitation package sent to Plaintiff through early 2005 disclosed that CompuCredit would permit Plaintiff to use only half of the credit line they purportedly had been granted until the fourth month after card activation, or that CompuCredit might decrease the credit line based on how Plaintiff used their cards.

50. In early 2005, CompuCredit revised its Core Visa card direct mail solicitation cover letter. In at least one revised typical and illustrative cover letter, CompuCredit represented, on the front side of the letter: **YOU have earned a new Aspire Visa Gold card. It can be used at millions of places around the world, and it costs you nothing to send for your card.! No deposit*! No application fee! Great credit line! \*\***

Use your new credit card to buy the things you want right away, or to get money from most cash machines. At the bottom of the page, in a smaller font than the representations described above, CompuCredit included several disclaimers, including a disclaimer after the "*" symbol instructing Plaintiff to "[s]ee the enclosed insert which is incorporated here by a reference for a Summary of Credit Terms and Terms of Offer. This offer is subject to further review of financial information." CompuCredit added a disclaimer on the bottom of the page, in a small font, after the "**" symbol, that "[f]ifty percent of your initial credit limit will be available to you as soon as your card is activated. Provided that your account had been used and maintained in a satisfactory manner, your entire initial credit line will be available to you on the first day of the fourth month following your account opening date."

51. On the back side, CompuCredit also represented: **no deposit Gold card. you do not have to send any money to get your Visa® Great Credit Line*** up to the total on the Acceptance Certificate. Plus, as long as you are an active customer in good standing, we will raise the amount as soon as we can. At the bottom of the page, in a smaller font than the representations described above, CompuCredit has included several disclaimers, including a disclaimer after the "*" symbol, that "[f]ifty percent of your initial credit limit will be available to you as soon as your card is activated. Provided that your account had been used and maintained in a satisfactory manner, your entire initial credit line will be available to you on the first day of the fourth month following your account opening date." The "**" symbol instructs Plaintiff to "[s]ee the enclosed insert which is incorporated here by a reference for a Summary of Credit Terms and Terms of Offer. This offer is subject to further review of financial information."

52. On the Terms of Offer page, CompuCredit represented in a banner at the top of the page, folded to form a cover for the entire insert:
**No Annual Fee • Pre-Qualified • No Hassle The body of the revised Terms of Offer page contained dense text printed in a small font.** In the middle of the page, CompuCredit inserted a disclaimer that "[w]e reserve the right to change (to set, increase, decrease or remove) the credit limit for your account and/or for different types of account balances from time to time. Such changes may occur without prior written notice to you and may be based upon factors including, but not limited to, anti-fraud policies and

procedures, behavior scoring, your credit history with us or with other creditors and/or changes in this or other card programs or bank policy."

53. Although at least one typical and illustrative cover letter revised in early 2005 included the disclaimer that CompuCredit could decrease the credit limit based on behavior scoring, the disclaimers were not made in a clear and prominent manner that Plaintiff would understand or notice.

54. In a typical and illustrative Aspire Core Visa card direct mail solicitation, CompuCredit has instructed Plaintiff who are interested in requesting an Aspire Visa card to complete and return the "Acceptance Certificate," or for faster processing, to call a toll-free telephone number or visit

**Internet**

**CompuCredit at www.aspireyes.com.**

55. For those Plaintiff who called the toll-free number, CompuCredit has employed a telephone script that avoided disclosure of the fact that CompuCredit would permit Plaintiff to use only half of the credit line they purportedly had been granted until the fourth month after card activation. Instead, CompuCredit's phone agents have first collected all of the Plaintiff' application information, attempted to sell Plaintiff various services that would be billed directly to the card, and provided a lengthy explanation of the APR, the grace period, the USA Patriot Act and the method of computing finance charges, before disclosing that the Plaintiff would have access to only half of their credit line until the fourth month.

**Card Fulfillment Materials**

56. After Plaintiff who have completed the Core Visa card application process have been approved, CompuCredit has mailed them a Visa card accompanied by a card carrier that sets forth, in bold print at the top of the page, the full amount of the credit limit CompuCredit purportedly has granted. The card carrier also has instructed Plaintiff on how to activate the card, has set forth, often in bold print, the benefits of using the card, and has represented in prominent text set apart from other text on the page, "It's your credit use it whenever and wherever you want!" In numerous instances, however, the card carrier has not disclosed, or has disclosed inconspicuously in fine print, that

CompuCredit would permit Plaintiff to use only half of the credit line they purportedly had been granted until the fourth month after card activation.

57. In addition, in numerous instances, the fulfillment materials have represented, in boldface type on the front page, that the consumer would enjoy "Instant Cash access" as a primary "cardholder benefit[]" after activating the card.

### Marketing the Majestic Visa Program

58. Since approximately 2004, CompuCredit has marketed Visa credit cards to Plaintiff with unpaid debts that have been charged off by prior creditors, including debts that were no longer subject to suit under the applicable statute of limitations and debts that were no longer being reported by consumer reporting agencies because they were outside the seven-year limitation period set forth in Section 605 of the FCRA, 15 U.S.C. § 1681c.28

59. The "Majestic" Visa program and its solicitations, discussed below, are typical and illustrative of CompuCredit's business practices in this regard.

60. As described below, CompuCredit's written solicitations for the Majestic Visa program mislead Plaintiff who had prior unpaid debts into believing that they immediately would receive new credit cards with their prior unpaid debts transferred to the new cards and reported to consumer reporting agencies as paid in full. In truth, Plaintiff accepting these cards essentially signed up for repayment programs for their old debt. In fact, Plaintiff did not qualify for the new cards until they paid 25-50% of their old debt balances. Further, even if they paid the required portion of the old debt balances the credit lines received only equaled 5% of the original debt amounts.

61. CompuCredit has marketed the Majestic Visa card with its wholly-owned debt collection subsidiary, CompuCredit has sent letters to more than 3.6 million Plaintiff representing that their charged-off "account has been placed by [a third-party debt purchaser or creditor] with us for collection" or specifying the amount of a charged-off debt owed on a consumer's Aspire Visa account. In these letters, CompuCredit has told Plaintiff that it is "pleased to provide you with an opportunity to satisfy this debt and enjoy the convenience and benefits of a new Visa card." Defendant also has represented that "[w]hen you accept the accompanying offer and are approved, the Amount Due

shown above will be transferred to a new Majestic Visa account at a fixed 0% APR as the first transaction on the new account."

62. Enclosed with these letters has been a CompuCredit Majestic Visa solicitation insert that has told Plaintiff to **"Sign Up Today!"** and "Get a new start with the Majestic Fresh Start Solution and pre-approved unsecured Visa card. Soon you can enjoy all the convenience and benefits Visa has to offer." The solicitation also has told Plaintiff that the card will have "Available Credit for Purchases and Cash Advances

### Servicing Aspire and Majestic Visa Accounts

63. CompuCredit has maintained and serviced Aspire and Majestic Visa accounts. As a credit card account servicer, CompuCredit directly or indirectly collects and processes Plaintiff' payments, including annual and monthly maintenance fees, and assesses, collects, and processes late-payment and over-the limit fees. In addition, CompuCredit provides customer service functions, including providing a customer service telephone number.

### Aspire Little Rock Visa Annual and Monthly Maintenance Fees

64. In numerous instances, shortly after Plaintiff has received Little Rock Visa card fulfillment materials, the consumer also has received an initial credit card account statement claiming that the consumer owes a $20 "minimum payment." These statements also show, for the first time, that the consumer is being charged the full amount of the annual fee, the account opening fee and the first monthly maintenance fee up-front and regardless of whether the consumer has actually used the card.

### Count I: Denying Plaintiff Access to Half of His Core Visa Credit Lines and Reducing Plaintiff's Core Visa Credit Lines

65. In numerous instances, CompuCredit has denied Aspire Core Visa card holders the use of half of the credit lines they purportedly were extended until the fourth month after the account has been activated.

66. In numerous instances, CompuCredit also has reduced Aspire Core Visa card holders' credit limits, often prior to the fourth month after activation, when CompuCredit otherwise would have given Plaintiff access to the full credit line CompuCredit purportedly had extended.

67. In some instances, CompuCredit reduced subscribers' credit limits to levels below their existing balances and then charged over-limit fees.

Handling Customer Service Telephone Calls

68. In many instances, Plaintiff who has called CompuCredit's customer service centers could access only an automated telephone response system that asked for an account number. Based on the number entered, Plaintiff whose accounts had been classified as past due was not provided the option to reach a live operator.

69. Regardless of the payment status of Plaintiff' accounts, in numerous instances, Plaintiff who have called CompuCredit's customer service centers have been unable to navigate the phone system in order to reach a live operator. As a result, Plaintiff have complained that they have been unable to address card-related problems, questions, or other issues, such as disputing erroneous fees and charges, CompuCredit's failure to timely post Plaintiff' payments, and requesting cancellation of their cards as a result of these problems.

## Debt Collection Practices
## Count II: Failure to Disclose Fees

70. In the course and conduct of offering and extending credit under one or more credit card programs, including but not limited to the Aspire Little Rock Visa program, CompuCredit has represented, expressly or by implication, among other things, that Plaintiff were "Pre-Qualified" to obtain a specified amount of available credit with **"No deposit required," "No Deposit Fee," and "No Application Fee."**

71. CompuCredit has failed to disclose, or has failed to disclose adequately, that it would impose substantial up-front fees, including an annual fee, an account opening fee, and a monthly maintenance fee.

72. In light of the representations set forth in Paragraph 86, CompuCredit's failure to disclose, or failure to disclose adequately, the material information set forth in Paragraph 87, is a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III: Failure to Disclose How Use of The Credit Card Adversely Affects Available Credit

73. In the course and conduct of offering and extending credit in one or more credit card programs, including but not limited to the Aspire Core program, CompuCredit has represented, expressly or by implication, among other things, that Plaintiff have been "Pre-Qualified" to obtain credit of "up to" a specified limit and that active customers including the Plaintiff in who was good standing will be considered for periodic increases in available credit. CompuCredit further has represented that Plaintiff can use the card for specified transactions and benefits.

74. CompuCredit has failed to disclose, or has failed to disclose adequately, that it was employing a behavioral scoring model that reduced Plaintiff' credit lines if they used their cards for certain types of transactions, including transactions expressly mentioned in the solicitations.

75. In light of the representations set forth in Paragraph 89, CompuCredit's failure to disclose, or failure to disclose adequately, the material information set forth in Paragraph 90, is a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV: Misrepresentation of Debt Collection Program to Plaintiff

76. In the course and conduct of marketing one or more credit cards, including but not limited to the Majestic Visa card, Defendant has represented, expressly or by implication, among other things, that upon acceptance of a consumer's "Pre-Approved" application, the consumer would immediately receive a Visa Card, the Plaintiff's old debt balance would be immediately transferred to the card and be reported to consumer reporting agencies as "paid in full," and the consumer's formerly charged-off debt would be satisfied and the consumer would build new credit.

77. In truth and in fact, upon acceptance of Plaintiff's' pre-approved applications, Defendants have not immediately extended to Plaintiff a Visa card, transferred Plaintiff' old debt balances to the card, reported the old debt as "paid in full" to consumer reporting agencies, and satisfied Plaintiff' formerly charged-off debt, allowing them to build new credit. Therefore, Defendants' representations as alleged in Paragraph 92 are false or

misleading. Defendants' practices constitute deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## FAIR DEBT COLLECTION PRACTICES ACT VIOLATIONS

78. 95. In 1977, Congress passed the FDCPA, 15 U.S.C. §§ 1692-1692p, which became effective on March 20, 1978, and has been in force ever since that date. Section 814 of the FDCPA, 15 U.S.C. § 1692l, provides that a violation of the FDCPA shall be deemed an unfair or deceptive act or practice in violation of the FTC Act.

Count V: Misrepresentations

79. On numerous occasions, in connection with the collection of debts, CompuCredit has used false, deceptive, or misleading representations or means, in violation of Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10), including, but not limited to, representing expressly or by implication, among other things, that upon acceptance of a consumer's "Pre-Approved" application, the consumer would immediately receive a Visa Card, the Plaintiff's old debt balance would be immediately transferred to the card and be reported to consumer reporting agencies as "paid in full," and the Plaintiff's formerly charged-off debt would be satisfied and the Plaintiff would build new credit.

### Count VI: Abusive Collection Practices

80. In connection with the collection of debts, Defendant has engaged in conduct the natural consequence of which is to harass, oppress, or abuse a person, in violation of Section 806 of the FDCPA, 15 U.S.C. § 1692d, including, but not limited to:

(a) Using obscene or profane language or language the natural consequence of which is to abuse the hearer, in violation of Section 806(2) of the FDCPA, 15 U.S.C. § 1692d(2); and

(b) Causing a telephone to ring or engaging a person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass a person at the number called, in violation of Section 806(5) of the FDCPA, 15 U.S.C. § 1692d(5).

## PLAINTIFF INJURY

81. The Plaintiff has suffered, and will continue to suffer, substantial injury as a result of Defendants' violations of Section 15 U.S.C. 1681, et seq, of the Fair Credit Reporting Act and Section 5(a) of the FTC Act and the FDCPA, as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 814 of the FDCPA, 15 U.S.C. § 1692l, and 15 U.S.C. 1681, et seq, of the Fair Credit Reporting Act and the Court's own equitable powers:

(a) Award the Plaintiff $250,000.00 as for punitive and compensatory damages respectively and any other such relief as the Court finds necessary to prevent unjust enrichment and to redress injury to the Plaintiff resulting from Defendants' violations of the FCRA, FTC Act and the FDCPA, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

(b) Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: October 15, 2008

Respectfully submitted,

Kenneth A. Hinton, Plaintiff
2200 Wilson Blvd., Ste 102-004
Arlington, VA 22201
(Ph):571-228-4424